FILED
97 DEC 29 AM 5:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CAROLYN JESSEN,              }
                             }
    Plaintiff,               }
                             }
vs.                          }   CIVIL ACTION NO.
                             }
DATA PREPARATION, INC., et   }   CV-96-AR-2292-S
al.,                         }
                             }
    Defendants.              }

ENTERED
DEC 29 1997

**MEMORANDUM OPINION**

The court has for its consideration the motion of defendants, Data Preparation, Inc. ("DPI"), First Financial Management Corporation, ("FFMC"), and First Data Corporation ("FDC"), for summary judgment in the above-entitled diversity action. Plaintiff, Carolyn Jessen ("Jessen"), formerly the president and sole shareholder of DPI, has sued defendants alleging breach of contract and fraudulent suppression. For the reasons set out more fully below, the court determines that no genuine issue of material fact exists with respect to Jessen's fraudulent suppression claim and, therefore, that defendants are entitled to judgment as a matter of law on that claim only.

### I. *Pertinent Undisputed Facts*

DPI was a data processing services company based in Birmingham, Alabama. In or around 1973, Jessen rose to become DPI's sole shareholder and president. (Jessen Aff. at ¶ 2A;

1

Jessen Dep. at 12). From rather humble beginnings, Jessen built DPI into a sizeable company with hundreds of employees and millions of dollars in annual revenues. Over the course of this growth, DPI acquired several large and impressive clients, including Federal Express and the State of Alabama.

In June, 1989, Ken James ("James"), president of Appalachian Computer Services, Inc. ("ACS"), a wholly-owned subsidiary of FFMC and DPI's largest competitor, phoned Jessen and informed her of FFMC's interest in purchasing DPI. (Jessen Dep. at 13). Following this initial contact, Jessen met with James in person to discuss a possible merger. (Id. at 16-17). Within a few weeks of FFMC's initial offer, she agreed to merge DPI with DPI Acquisition Corp., another wholly-owned subsidiary of FFMC, and the parties' entered into the "Merger Agreement." (Id. at 18; Defs. Exh. 1). Throughout the merger negotiations, Jessen was represented by counsel. (Id.). At the time of the merger, Jessen also entered into a three-year employment contract with FFMC.[1] (Defs. Exh. 1B).

Under the terms of the Merger Agreement, Jessen received the following initial consideration: (1) $2.5 million in cash; and (2) $600,000 worth of FFMC stock. (Jessen Dep. 20, 23). Jessen later sold the FFMC stock at a profit. (Id. at 23-24).

---

[1] Under the terms of the three-year employment contract, Jessen received a minimum annual salary of $100,000.

The Merger Agreement also provided that Jessen would receive deferred payments — called "earnouts" — for each of the first five "SubCorp" years after the merger. Essentially, Jessen's earnout payments were to be calculated as a percentage of the revenues DPI earned during each of the five SubCorp years on seventy-two DPI contracts specified in the Merger Agreement. (Id. at 21-22).

Following the merger, Jessen soon became dissatisfied with the agreement. According to Jessen, as early as January, 1990, she met with James to discuss her concerns, including her concerns regarding the management of DPI and the future security of her earnout payment. (Defs. Exh. 2 to Jessen Dep.). In her deposition, Jessen testified that, at this meeting, James informed her that FFMC's intent in purchasing DPI was to eliminate its competition in the data processing services market. (Jessen Dep. at 53, 64-65). Jessen also testified that, during this meeting, James confirmed for her that FFMC would not "guarantee" her earnout payments. (Id. at 64-65).

Over the next few years, problems at DPI began to mount. These problems culminated in a series of business reversals in 1993. According to Randolph Hutto, FFMC's general counsel, by 1993, DPI had became unprofitable. (Hutto Dep. at 68, 74, 83). Additionally, in May, 1993, Federal Express, one of DPI's largest customers, informed Jessen that it would not renew its contract

3

with DPI. (Defs. Exh. 6). Finally, in or about the summer of 1993, DPI's workforce made efforts to unionize. (Hutto Dep. at 59). After these developments took place, FFMC decided to close DPI in September, 1993. At some point prior to September, 1993, DeWayne McAfee ("McAfee"), Jessen's immediate supervisor, informed Jessen of FFMC's decision to close DPI and told her "that she would not be hurt personally on the earn-out" as a result. (Defs. Br. at 6; McAfee Dep. at 34).

By the time FFMC closed DPI, Jessen already had received the first four of the five earnout payments required by the Merger Agreement. (Pl. Br. at 3). However, when FFMC tendered the fifth and final earnout payment in February, 1995, Jessen was not satisfied with its amount. (Id. at 4). In her view, the fifth payment failed to include "any sum that DPI was prevented from earning by the closure of DPI by FFMC." (Id.). On February, 17, 1995, in a letter Jessen voiced her concern over the amount of the fifth earnout payment to FFMC. (Pl. Exh. 6 to Hutto Dep.). In response to Jessen's letter, FFMC later offered to increase the fifth earnout by an additional $47,600.[2] Claiming that this additional amount failed to include payment for revenues DPI would have earned it had retained the Federal Express contract, Jessen refused the offer. This lawsuit followed.

---

[2] The parties do not dispute that, prior to this offer, Jessen had already received approximately $701,000 as part of her fifth earnout payment. See Jessen Dep. at 26.

4

## II. *Summary Judgment Standard*

Rule 56, Fed.R.Civ.P., states in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Eleventh Circuit also has observed that "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994). Defendants have invoked Rule 56.

## III. *Discussion*

### Jessen's Fraudulent Suppression Claim.

As noted above, Jessen's amended complaint includes a claim for fraudulent suppression. In bringing this claim, she alleges that:

> Defendants . . . had an obligation to inform [her] of its [sic] intention to close DPI. This duty to communicate existed not only because the parties were discussing going into business together, but because of the five-year earnout that FFMC agreed to pay to Jessen.

Amd. Complt. at ¶ 18. The parties agree that Alabama law governs Jessen's fraudulent suppression claim. (Pl. Br. at 8 n.3; Defs. Br. at 10 n.4).

Under Alabama law, "[c]laims of fraudulent . . . suppression

5

are subject to a two-year statute of limitations." Foremost Ins. v. Parham, 693 So.2d 409, 417 (Ala. 1997) (citing ALA. CODE § 6-2-38(1) (1975)). "The two-year period begins to run when the plaintiff discovers, or should have discovered, the fraud." Lambert v. Bill Heard Chevrolet Co., 695 So.2d 15, 17 (Ala. Civ. App. 1996). Normally, "[t]he question of when a party discovered or should have discovered fraud which would toll the statute of limitations is for the jury." Kelly v. Connecticut Mut. Life Ins. Co., 628 So.2d 454, 458 (Ala. 1993). However, that question may be taken away from the jury and decided as a matter of law in cases where the plaintiff *actually* knew of facts that would have put a reasonable person on notice of fraud. See Hicks v. Globe Life and Acc. Ins. Co., 584 So.2d 458, 463 (Ala. 1991) (articulating "justifiable reliance" standard).[3] In other words, "'[i]t is sufficient to begin the running of the statute of limitations that [the] claimant *knew of facts* which would put a reasonable mind on notice of the possible existence of fraud.'" Id. (quoting Seybold v. Magnolia Land Co., 376 So.2d 1083, 1087 (Ala. 1979)) (alteration and emphasis in original).

Essentially, the thrust of Jessen's fraudulent suppression

---

[3] The Supreme Court of Alabama recently overruled Hicks and the "justifiable reliance" standard. See Foremost Ins. v. Parham, 693 So.2d 409, 421 (Ala. 1997) (overruling Hicks and rejecting "justifiable reliance" standard). In so doing, the supreme court returned to the "reasonable reliance" standard, and it made that standard applicable in all fraud cases *filed after* March 14, 1997. As Jessen filed her amended complaint in December, 1996, the court will continue to apply the justifiable reliance standard to her fraudulent suppression claim.

6

claim is that defendants failed to disclose their intention to close DPI in a way that would affect her earnout payments. (Pl. Br. at 11). Jessen admits that she became aware of defendants' plan to close DPI in 1993. Nevertheless, she contends that her fraudulent suppression claim did not "accrue" until she received the contested fifth earnout payment in 1995. (Pl. Br. at 7-8). In part, defendants argue that, because Jessen had actual knowledge in 1993 that defendants planned to close DPI, her fraudulent suppression claim is barred by the applicable statute of limitations. (Defs. Reply Br. at 8). Defendants' argument is well taken.

It is undisputed that, prior to September, 1993, McAfee informed Jessen that FFMC would soon close DPI. It is also undisputed that FFMC closed DPI in September, 1993. Finally, it is undisputed that the fifth SubCorp year ended on July 31, 1994. Thus, it is clear that, as of September, 1993, Jessen had actual knowledge that defendants intended to close DPI prior to the end of the fifth SubCorp year — an event that could adversely affect the size of her fifth earnout payment. Therefore, the court concludes that Jessen's knowledge as of September, 1993, was sufficient to put a reasonable person on notice of the possible existence of fraud. As such, it triggered the running of the two-year limitations period.

This conclusion remains unchanged even if one considers the

7

fact that, in informing Jessen of DPI's imminent closure, McAfee assured her that her earnout payments would remain unaffected. McAfee's assurance is completely inconsistent with the earlier representation that Jessen claims that James made concerning the guarantee of her earnout payments. Moreover, the fact that Jessen now contends that McAfee's assurance orally modified the Merger Agreement strongly suggests that, at the time, she considered the assurance to be a departure from the parties' original bargain. Thus, at a minimum, McAfee's unspecific assurance did not comport with the parties' prior business dealings, and, as such, it was sufficient to put a reasonable person on notice of possible fraud such that the two-year limitations period began to run at the time it was made — that is, some time prior to September, 1993. *Cf.* <u>First Fed. S & L Ass'n of Miami v. Mortgage Corp.</u>, 650 F.2d 1376, 1378 (5th Cir. 1981) (concluding that events contrary to earlier representations should have prompted further inquiry into possible fraud). Therefore, given that Jessen brought her fraudulent suppression claim in 1996, the said claim is untimely, and summary judgment on that claim is appropriate.

### IV. *Conclusion*

The court will enter a separate and appropriate order in accordance with this memorandum opinion.

8

DONE this 29th day of December, 1997.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE